The ESTATE OF Albert L. WHITLING, Jr., by Doris J. WHITLING, Executrix of the Estate, and Doris J. Whitling, Individually, and Adam L. Whitling, Jeramy R. Whitling and Neica M. Whitling, Beneficiaries of the Estate, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

No. CIV. A. 97–275.

United States District Court, W.D. Pennsylvania.

March 31, 2000.

Michael E. Dunlavey, Erie, PA, for Plaintiffs.

Albert W. Schollaert, Asst. U.S. Atty., U.S. Attorney's Office, Pittsburgh, PA, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McLAUGHLIN, District Judge.

This civil action arises under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671–80. Plaintiffs filed a complaint for wrongful death alleging that the Veterans Administration Medical Center ("VA Medical Center") was grossly negligent in their treatment and diagnosis of Albert L. Whitling, Jr. and that they were grossly negligent in issuing him grounds privileges, failing to make a timely search for him after he disappeared and failing to properly supervise him. Plaintiffs allege that this negligence was the direct cause of Whitling's death. This Court held a non-jury trial on June 16 through June 23, 1999. Set forth below are the Court's Findings of Fact and Conclusions of Law.

### I. FINDINGS OF FACT

1. Albert L. Whitling, Jr. ("Whitling") was born on April 15, 1950. He served in an active duty capacity in the United States Army from 1968 through 1971, including Vietnam, and was honorably discharged from active duty.

2. On January 25, 1973, Albert Whitling married Doris Whitling. He adopted Doris' son Stephan and they subsequently gave birth to four other children: Trissell, Adam, Jeremy and Neica.

3. Whitling worked in a variety of positions including as a laborer at a steel molding company and a roofing company. On the date of his disappearance, July 21, 1993, he was employed as a custodian by the United States Post Office. He also served in the United States Army Reserve in the 4th/92nd Artillery Battalion in Meadville and Erie, Pennsylvania from 1972 through the date of his disappearance. He had advanced to the rank of Sergeant First Class.

4. On May 23, 1972, after spending several weeks in the reserves at camp, Whitling was admitted to Oil City Hospital in an acutely depressed and anxious state, due partly to recurrent thoughts of his early life and of Vietnam. He was reportedly quite upset, had marked feelings of depression and persecution, and had feelings of guilt and worthlessness. He was also very paranoid and had thoughts of hurting himself. During his stay at the hospital, he was tried on a few short passes for an hour or two in duration. He became very upset, panic stricken, and unable to function, however, and was therefore returned to the hospital. He was discharged on June 17, 1972 with a prescription for Etrafon and a diagnosis of psychotic depression.

5. On June 26, 1972, Whitling was examined by the Veteran's Administration. He was diagnosed with reactive depression, chronic, in partial remission, manifested by persistent depression, feeling inferior, self-condemnation and self guilt. Subsequently, on April 27, 1973, based partly on the June 26, 1972 examination, Whitling was granted a thirty-percent service-connected VA disability pension for a "nervous condition."

6. On February 12, 1979, Whitling was admitted to Meadville City Hospital in a very depressed state. He told the hospital staff that he felt like other people were after him to kill him and he stated that he was getting excited at the thought of killing them. He was diagnosed with depression, including feelings of helplessness and hopelessness. He was discharged on February 22, 1979.

7. Whitling was readmitted to Meadville Hospital on March 14, 1979. While there, he had delusions of persecution, auditory hallucinations and suicidal and homicidal ideations. He was treated with Navane and was quoted as saying, "the voices

have been telling me to go to sleep." He also stated that people were laughing at him and trying to kill him. He was diagnosed with schizophrenia, paranoid type.

8. Whitling was transferred from Meadville Hospital to the VA Medical Center on March 21, 1979. During his hospitalization at the VA Medical Center, Whitling was diagnosed with depression secondary to alcoholism. He exhibited vegetative symptoms including feelings of hopelessness and helplessness. His condition was improved when he was discharged on April 25, 1979.

9. Between 1979 and 1993, Whitling continued to participate in the Army Reserves. He attended reserve functions every Wednesday night and the second weekend of every month.

10. In the spring of 1993, Whitling learned that his Army reserve unit was going to be deactivated. According to his wife, he took this news very hard.

11. Whitling attended his annual reserve training in May of 1993 for two weeks. Prior to leaving for the training, he was very upset about the deactivation of his unit. While talking to his wife, he walked behind her, put her in an arm lock and began choking her and screaming. Their son Stephan had to intervene to stop the assault. This conduct was part of a course of physical and verbal abuse that occurred throughout their marriage.

12. On June 12, 1993, Whitling attended a reserve drill meeting. When he returned home, he was very agitated. After lying down to sleep, he suddenly screamed and stated that he had a revelation and saw the devil. He walked into the living room holding his head and screaming about the pain and about hearing voices. Thereafter, he threatened to kill himself by running his truck into a tree. However, his wife kept him occupied and told her son Adam to retrieve the keys from the truck. Later, Whitling did walk out to his truck; when he noticed that the keys were

missing, he tore off his clothes and ran screaming into the woods.

13. At this point, Mrs. Whitling called the Pennsylvania State Police. Three State Police Troopers responded and upon their arrival, Whitling came out of the woods and asked the troopers to kill him. When the troopers refused, he threatened to take their weapons and kill them, his family and himself. The troopers restrained him with mace and transported him to the Meadville Medical Center by ambulance.

14. Whitling was initially involuntarily committed to the Meadville Medical Center. He subsequently agreed to a voluntary admission to the psychiatric unit. Upon admission, he provided a history indicating a longstanding alcohol abuse problem and a long history of domestic violence towards his wife and children.

15. After a mental status examination, Whitling was diagnosed with major depression, recurrent and alcohol dependence. He was described as depressed, anxious and tearful throughout the examination. He denied any hallucinations or delusions but admitted to recent suicidal ideations and stated that he had high levels of guilt regarding his past behavior to his wife and children.

16. Whitling was initially placed on Librium to relax him and help him withdrawal from alcohol. He was also put on Level 2 suicide precautions but this was discontinued on June 14, 1993 when it became obvious that there was no further suicidal ideation. He was described as cooperative and highly motivated during his stay at Meadville Medical Center.

17. On June 16, 1993, Whitling was discharged from the Meadville Medical Center and transferred to the VA Medical Center at Highland Drive in Pittsburgh, Pennsylvania. His diagnosis upon discharge was post traumatic stress disorder and alcohol dependence.

18. Upon admission to the VA Medical Center, Whitling was referred to ward 4–

2–E, an acute psychiatric unit supervised by Dr. Raj K. Lall. In addition to Dr. Lall, the ward consisted of a full time psychologist—Dr. Mary Rumbaugh, a full time social worker—Tina Siszka, as well as nurses, a physician's assistant and several other mental health professionals.

19. Dr. Rumbaugh provided an initial diagnosis of alcohol dependence and major depressive episode, recurrent. She indicated that Whitling had moderate to severe psychosocial stressors, in particular extreme marital conflict. She also found that he had a Global Assessment of Functioning ("GAF") of 45. At trial, Dr. Mary Eileen McNamara, an expert for the Plaintiffs in the field of psychiatry, testified that a GAF between 41 and 50 indicates serious symptoms such as suicidal ideation, severe obsessional rituals or frequent shoplifting, or any serious impairment in social, occupational or school functioning, such as lack of friends or difficulty keeping a job.

20. On June 17, 1993, Whitling was seen by Dr. Daugherty, a staff psychiatrist who was covering for Dr. Lall while Lall was on leave. Daugherty made a provisional diagnosis of alcohol dependence, alcohol withdrawal syndrome, rule out dysthymic disorder, rule out depression, rule out adjustment disorder, rule out other drug abuse and mixed personality disorder. Whitling also saw Tina Siszka, who took a social and family history.

21. Whitling was granted grounds privileges on June 18, 1993 pursuant to the VA Medical Center's patient privileges/responsibilities policy that allowed certain patients to be afforded off-ward privileges during limited hours of the day. Under the policy, only an attending physician could grant a patient privileges. The policy allowed other mental health providers such as nurses to revoke or suspend privileges, however, upon infractions or an assessment that the patient's condition did not warrant privileges. Typically, a patient who was granted privileges would be allowed off the ward between the hours of 9:00 a.m. to 11:00 a.m., 1:00 p.m. to 4:00 p.m., and 6:00 p.m. to 8:00 p.m. The patients who were granted privileges were required to be back on the ward during certain periods of time such as at 11:00 a.m. and again at 1:00 p.m. when the nursing staff would do a head count. Whenever a patient was granted grounds privileges, hospital policy required that the patient's privileges and responsibilities be reviewed and the patient's acknowledgment of their understanding of their responsibilities be documented within the patient's medical records.

22. Whitling first utilized his grounds privileges on June 19, 1993. He returned a half hour late and was given a warning and reminded of the privilege hours. It was noted that he seemed to have a bit of an angry undertone after he received the warning.

23. Other than the interview with Dr. Daugherty and the interview with Dr. Rumbach to take a history, Whitling did not receive any psychiatric treatment or care between June 17, 1993 and June 20, 1993. Dr. Robert Wettstein, an expert for the Defendant in the fields of psychiatry and forensic psychiatry, testified that the hospital's failure to provide such treatment was negligent but it did not rise to the level of gross negligence.

24. In the afternoon of June 20, 1993, Whitling met with his family at the VA Medical Center. According to Mrs. Whitling, he was very withdrawn and did not say very much. Later that evening, at approximately 10:30 p.m., he had a severe psychotic episode. He became religiously preoccupied, shouting that "the gates of hell were opening up upon us all," and he began throwing chairs and overturning tables. He was also hallucinating and yelling "shut up, leave me alone" when there was no one in the room with him. A "Code Blue" was called and he was placed in full restraints and given Librium, Thorazine and Haldol. He remained in full restraints until 8:00 the following morning. Thereafter, he remained in partial re-

straints until approximately 1:00 p.m. on June 21, 1993.

25. There is no evidence in the VA medical record of a psychiatric evaluation or of counseling by Dr. Lall or any other staff member of the psychiatry ward on June 21, 1993. Dr. Lall testified that she met with him on this date while he was still in partial restraints but neglected to document her findings in the record. At trial, both Plaintiffs' expert, Dr. McNamara, and Defendant's expert, Dr. Wettstein, testified that it was a breach of the standard of care for Dr. Lall not to note her observations of Whitling's condition in the medical records. However, Dr. McNamara opined that the breach amounted to gross negligence while Dr. Wettstein concluded that it was only negligence. We credit the testimony of Dr. McNamara.

26. In the evening on June 21, 1993, Whitling was reportedly in good control and he denied hearing voices. He explained that he had a "religious experience" the previous night but has since forgiven himself for "everything". At trial, Dr. McNamara opined that Whitling was exhibiting psychotic symptoms at this point.

27. On June 22, 1993, Whitling was interviewed by Pat Wilson, the nurse manager of Substance Abuse Treatment Program ("SATP"), regarding his possible admission into the twenty-one day program. Based on the interview, she recommended that he be admitted. She also requested that Whitling be granted privileges. Subsequently, Lall agreed to the transfer and granted Whitling privileges. She stated that Whitling was in good control, his behavior was appropriate and he was using his privileges appropriately.

28. Wilson testified that it was necessary for all participants in the SATP to have grounds privileges since the nature of the program required participants to attend classes and at times to travel to various locations within the hospital. Further, the class sessions of the SATP were conducted during the day in a different sec-tion of the building than the residential quarters of the SATP.

29. Wilson stated that when she interviewed candidates for admission into the SATP, she would reject referrals who did not possess the cognitive capabilities to handle privileges or to attend and participate in the classes, group counseling sessions and other activities that comprised the 21-day program. She testified that she did not accept Whitling into the program until Thursday, June 24, 1993, because she wanted to ensure that he was off Librium for a sufficient amount of time and to also ensure that he could handle privileges appropriately. She stated that Whitling was not psychotic when she interviewed him on June 22, 1993.

30. Whitling was in fact transferred to the SATP unit on June 24, 1993. Dr. Lall's diagnosis on this date was alcohol dependence and a continuous history of bipolar disorder. Lall noted that Whitling denied psychotic symptoms and denied suicidal and homicidal ideations.

31. At the time of the transfer, the psychiatrists in the ward had still not attempted to ascertain what prompted Whitling's psychotic behavior on the evening of June 20, 1993. Aside from giving him Thorazine and Haldol, they also failed to treat him for this episode and failed to make any attempt to prevent a reoccurrence. Dr. Wettstein testified that this constituted negligence but did not rise to the level of gross negligence. Dr. McNamara opined that these omissions and the subsequent transfer constituted gross negligence. She stressed that the SATP did not have a psychiatrist on staff and could not provide effective treatment for his psychological and psychiatric problems. We credit the testimony of Dr. McNamara.

32. On June 27, 1993, Dr. Maxwell, a psychologist assigned to the SATP, mentally examined Whitling. During the examination, Whitling reported having suicidal ideation prior to admission but he denied current suicidal or homicidal idea-

tions. Dr. Maxwell's diagnosis was alcohol dependence, major depression, recurrent and a GAF of 50. His plan was to have Whitling participate in the 21 day substance abuse program, undergo group counseling with Andrea Danko, a social worker, and attend his own depression management group.

33. Whitling met with Danko on June 28, 1993. She noted that he evidenced PTSD symptoms and experienced trauma as a child and as a result of his Vietnam exposure. She stated that he had suffered from major depressive episodes and concluded that he needed to undergo a psychological evaluation.

34. Whitling met with Danko again on July 7, 1993. She indicated that he has had PTSD for years and that he was suffering from anxiety attacks. She stated that he repressed the child molestation and the Vietnam experiences. Whitling told her that he was afraid to return home.

35. Later in the evening on July 7, 1993, Whitling met with Jane McCelland, a nurse in the SATP unit. He requested that he be seen by a psychologist before being discharged because he was feeling anxious and apprehensive and afraid that he might hurt his family once he goes home. He stated, "I just get these thoughts and I feel a burning in my head." At trial, Dr. Wettstein testified that these statements do not evidence psychotic symptoms; he stated that they only demonstrate that Whitling was experiencing anxiety. Conversely, Dr. McNamara testified that these comments were similar to what Whitling was saying prior to the June 12, 1993 psychotic episode. She described the comments as aggressive ruminations and psychotic in nature. We credit the testimony of Dr. McNamara.

36. The next day, July 8, 1993, Whitling saw Dr. Maxwell. Maxwell determined that much of Whitling's anxiety was based upon his past physical abuse towards his wife, particularly an incident following his 1979 hospitalization in which he became irritated and tried to choke his wife. Whitling denied any homicidal ideations but worried that it might happen again without warning. Maxwell noted that the records of the previous hospitalizations were not available.

37. On July 9, 1993, the SATP staff held a treatment team review meeting. Danko told others at the meeting that Whitling was having anxiety attacks about going home. According to Danko, his fear of hurting his family was not discussed at the meeting.

38. Whitling met with Melanie Erskine, a nurse in the SATP, in the morning on July 11, 1993. She stated that he continued to appear sad and described poor sleep pattern and poor concentration. He was reportedly overwhelmed with obsessive thoughts of past family conflicts. He also questioned whether he should stay away from his family for longer recovery time to improve his mental health.

39. At approximately 1:30 in the afternoon on July 11, 1993, Whitling met with retired Army Command Sergeant Major Gregory Holland at the VA Medical Center. Holland testified that he and Whitling served in the same unit in the Army Reserves. He stated that Whitling looked much older on July 11, 1993 than he did a month earlier. He described Whitling as a basket case and stated that Whitling rambled and cried a lot during the visit. He testified that Whitling told him that he was extremely concerned that if he went home he would harm his wife and children.

40. At approximately 3:00 p.m. on July 11, 1993, a family education session was held. Whitling, his wife and their children attended and watched a video tape. Chaplain Lampkin also attended. After the session, Whitling and his wife began to argue in the hallway. Chaplin Lampkin and the family then went into a private room. Whitling spoke at length of his past behavior and his concern that he caused damage to the family. He asked for forgiveness and help in his recovery. His

wife and kids expressed their fear of him and their desire to help him.

41. On July 14, 1993, Whitling called his wife and told her that they were making him leave the following day. He told her that he knew that if he came home, he was going to kill himself, her and their children. He told her not to pick him up and asked her to help convince the VA Medical Center not to make him leave.

42. There are no entries in the VA Medical Center records for psychiatric or psychological treatment or counseling of Whitling for July 12, 13, 14 or 15, 1993. Andrea Danko testified that she was surprised by this and she had no explanation for the lack of entries. Dr. McNamara testified that Whitling should have been evaluated by a psychiatrist as soon as he expressed fears of hurting his family. She stated that it was "striking" that there were no entries for these dates when there should have been more entries than usual.

43. The next day, on July 16, 1993, Whitling approached Dr. Ubinger in an anxious and depressed state and told him that he was afraid that he might lose control of himself if he went home. He also stated that he was fearful of hell and requested that he be allowed to stay at the VA Medical Center a little longer in order to receive psychiatric help. Ubinger spoke to Dr. Lall and Lall agreed to readmit him to the psychiatric ward.

44. Whitling was in fact readmitted to the psychiatric ward on July 16, 1993. Thereupon, he told a nurse that he was very anxious and could not separate reality from fantasy. The nurse noted that he was also religiously preoccupied. At trial, Dr. Wettstein testified that this entry did not demonstrate that Whitling was psychotic, only that he suffered from anxiety. Wettstein explained that a patient who is psychotic would not be capable of admitting that he cannot separate reality from fantasy. Conversely, Dr. McNamara testified that Whitling was exhibiting psychotic symptoms at this point. She testified that his admission that he could not separate reality from fantasy is virtually the definition of psychosis. Further, she testified that the reference to religious pre-occupation, when used by a mental health person, is in fact a psychotic symptom. We credit the testimony of Dr. McNamara.

45. Lall also examined Whitling on July 16, 1993. She indicated that Whitling was depressed about his discharge and fearful of life, especially of darkness. Whitling denied suicidal or homicidal ideations and denied psychotic symptoms. Lall diagnosed him with bipolar disorder and initiated treatment by prescribing Lithium. She also granted Whitling privileges.

46. At trial, Dr. Wettstein testified that Dr. Lall's treatment on this date met the requisite standard of psychiatric care. He stated that the American Psychiatric Association practice guidelines support the decision to use Lithium as the sole medication for Whitling's Bipolar Disorder. He also testified that Dr. Lall's decision to grant privileges on July 16, 1993 met the appropriate standard of care. He reasoned that Whitling had spent three weeks in a substance abuse treatment program where he used such privileges appropriately.

47. On the other hand, Dr. McNamara testified that Lall's diagnosis and findings on this date constituted a gross deviation from accepted standards of psychiatric care. She stated that there was no history or evidence that Whitling had Bipolar Disorder. She criticized Lall's statement that there were no psychotic symptoms, stating that it was as if Lall did not read Dr. Ubinger's note. Dr. McNamara also testified that Lall's decision to treat Whitling with Lithium on this date was grossly negligent. She described Lithium as an anti-anxiety and an alcohol detox medication that functions as a mood stabilizer. She stated that it should not be prescribed as the sole medication for someone who suffers from depression and substance abuse; it should be accompanied by an anti-depressant or an anti-psychotic drug. She

opined that it was gross negligence because Lithium takes four to six weeks to have an effect and the hospital allowed him to have privileges during this time. In this regard, she also testified that Dr. Lall's decision to grant privileges on July 16, 1993 was a gross deviation from accepted standards of psychiatric care. She stated that Whitling should have been in a locked ward because the hospital had ample evidence that he was a danger to himself or others. We credit this testimony.

48. On July 17, 1993, Whitling was observed as quiet and isolative. He was sitting in a room apart from others and his facial expression was sad and stressed. He admitted to having a lot to think about. He used his privileges in the late afternoon.

49. Whitling utilized his privileges again on July 18, 1993. Although privilege policy required that he return by 11:00 a.m., he did not return until after 1:00 p.m. Hospital procedures required that he be reported missing and a search take place but those procedures were not followed. There was no attempt by the hospital staff to determine why he failed to return on time. He was informed, however, that he violated privilege procedure and that his privileges would be revoked.

50. As Whitling was being informed of this, his wife, Adam and Neica arrived for a visit. Mrs. Whitling testified that he was cold and distant during the visit. He was also very quiet and just stared into space. At one point, he stared at his daughter Neica until she moved away from him and towards her mother.

51. Whitling was not seen by Dr. Lall or any psychiatrist on July 17, 18, or 19, 1993. Dr. Wettstein testified that this was a deviation from the standards of accepted psychiatric care but that it did not rise to the level of gross negligence. Dr. McNamara testified that the hospital's failure to treat him on July 17, 1993 was gross negligence. We credit the testimony of Dr. McNamara.

52. On July 20, 1993, Whitling met with the treatment team of the acute psychiatry unit. He told them he was fearful and paranoid about returning to home and work. He was reportedly becoming religiously preoccupied and trying to "get into heaven." Dr. Wettstein testified that these comments do not suggest psychosis, only that Whitling is anxious. Conversely, Dr. McNamara testified that Whitling is clearly psychotic at this point because paranoia and religious preoccupation are characteristics of psychosis. We credit the testimony of Dr. McNamara.

53. Whitling also met individually with Dr. Rumbaugh. Rumbaugh reported that Whitling was concerned that he did not have adequate skills to cope with his job and family. He told her he was afraid that his medical records would be available to his supervisors and he would be scrutinized. He denied suicidal or homicidal ideation.

54. On July 21, 1993, Whitling did not return after exercising his privileges. He was last seen outside building one by another patient at 9:30 a.m. He was declared missing after he did not make his 11:00 a.m. check-in time.

55. Larry Drill, a social worker at the VA Medical Center, called Mrs. Whitling that afternoon to inform her that her husband was missing. Mrs. Whitling immediately drove to the hospital, arriving there in the evening on July 21, 1993. She informed hospital staff that she was afraid her husband would hurt himself. She was referred to the admissions area of the hospital and subsequently conducted a cursory search of the hospital grounds with a hospital security officer in a patrol car. When this effort failed to produce any evidence of Whitling's whereabouts, she became upset with the security officer, telling him that she was not satisfied with the search. The officer told her that there was nothing else they could do.

56. On July 22, 1993, Mrs. Whitling filed a missing person's report with the

Pittsburgh Police. She also spoke with hospital staff again and expressed her concern that neither she nor Whitling's parents had heard from him. There was no attempt to search for Whitling on July 22, 1993.

57. The next day, July 23, 1993, the Director of the VA Medical Center authorized a full scale search. The search began at 9:30 a.m. and ended at 11:35 a.m. Hospital personnel searched outside the perimeter of the fence line to the east of the hospital in the wooded area and also searched the area below the chapel west of the hospital fence line down to Highland Drive which is a very steep wooded area. Part of this area is now occupied by the new Pennsylvania Veteran's Home.

58. In addition to the cursory and full-scale searches conducted by the hospital, Mrs. Whitling conducted several searches of the grounds and the surrounding area on her own. She also distributed and hung up numerous missing person posters with Whitling's photograph on them. Further, Gregory Holland testified that he and several other reserves who knew Whitling searched through the woods and through the Pittsburgh area.

59. Later in the day on July 23, 1993, Nurse Merriman recorded Whitling's disappearance in his medical file. She noted that prior to his disappearance, Whitling had denied suicidal and homicidal ideations but indicated that he was fearful about returning home and to work. She stated that he felt that people were surveilling him at work and while he was in the hospital. Dr. Wettstein testified that concerns about surveillance could be a symptom of psychosis. He did not believe it was in Whitling's case, however; he opined that Whitling simply meant that he was being watched by the hospital staff. On the other hand, Dr. McNamara indicated that Whitling's complaint was a classic paranoid statement.

60. On May 11, 1994, Whitling's body was found in a wooded ravine located approximately a quarter of a mile from the VA Medical Center. This area was not searched by employees of the VA Medical Center on July 23, 1993.

61. Due to the decomposition of Whitling's remains, the date and cause of death could not be definitely established. The Coroner's office for Allegheny County, Pennsylvania listed the date of death as the date the remains were found. Dr. Eric Lee Vey, a forensic pathologist, performed an autopsy and issued a report in 1994. He described the remains as in a state of advanced decomposition with extensive skeletonization.

62. Dr. Vey testified at trial as an expert in the field of forensic pathology. He stated that the position and location of the remains were most consistent with an accidental injury such as tumbling down the embankment to the bottom of the ravine. He ruled out the possibility that Whitling died as a result of a homicidal event, stating that an examination of the bony skeleton and the clothing did not reveal any evidence of trauma caused by a third party. He also ruled out the possibility that Whitling died a natural death stating that it would be inconsistent with the position in which the remains were found and his medical history.

63. Dr. Vey testified that if Whitling had been injured, he could only have survived five days after the onset of the injury. He opined that the lack of access to water would have resulted in dehydration and electrolyte and metabolic disturbances physiologically would have resulted in his death.

64. Dr. Wettstein testified that a psychotic symptom or psychotic disorder or event is one in which there is substantial or major departures from reality. He stated that when a person claims to hear voices talking to him when no voices actually exist, he is exhibiting a psychotic symptom. Further, he indicated that a person's belief that there is surveillance going on or that someone is watching or

**646**

trying to poison him is characteristic of psychosis. We credit this testimony.

65. Both Dr. Wettstein and Dr. McNamara testified that Whitling experienced a severe psychotic episode on June 20, 1993. Dr. Wettstein testified that Whitling did not exhibit any psychotic symptoms after June 20, 1993. He repeatedly characterized Whitling's statements in mid July 1993 as an expression of anxiety. Conversely, Dr. McNamara testified that Whitling was clearly psychotic and a danger to himself and others at various times in the middle of July of 1993, including on July 7, July 16 and July 20, 1993. We credit the testimony of Dr. McNamara.

66. Dr. Wettstein concluded that the psychiatric care provided to Whitling by the VA Medical Center met the accepted standards of psychiatric care with four exceptions. He testified that the hospital breached the standard of care in that (1) it failed to provide Whitling with psychiatric treatment on June 18 through June 20, 1993; (2) Dr. Lall failed to document her observations of Whitling after he experienced the psychotic episode on June 20, 1993; (3) it transferred Whitling to the SATP without attempting to assess or diagnose the psychotic episode that occurred on June 20, 1993; and (4) it failed to provide Whitling with psychiatric care on July 17 through July 20, 1993. However, he concluded that those four deviations from the accepted standard of care did not rise to the level of gross negligence.

67. Wettstein testified that the fact that the VA Medical Center did not provide Whitling with daily antipsychotic medication was not a deviation from the accepted standard of care. He stated that antipsychotic medication is appropriately used only when individuals demonstrate signs and symptoms of psychosis. He concluded that Whitling did not demonstrate ongoing psychotic symptoms. According to Wettstein, even if the hospital provided Whitling with daily antipsychotic medication beginning on June 21, 1993, it would be speculative to conclude that the out- come would have been any different since the manner and cause of Whitling's death is unknown.

68. Dr. McNamara concluded that the care and treatment provided to Whitling by the VA Medical Center was a gross departure from the accepted standards of psychiatric care. She indicated that it was grossly negligent not to have treated Whitling with antipsychotic medications on a continuing basis. We credit this testimony.

69. Dr. Wettstein testified that it was not inappropriate for the hospital to grant Whitling grounds privileges prior to his disappearance on July 21, 1993. He reasoned that Whitling had repeatedly denied suicidal or homicidal ideations, intentions and plans, he had the capacity to understand the terms and conditions of his privileges, he had not been behaving inappropriately in the hospital for the previous month, and he had demonstrated appropriate use of the grounds privileges during the course of his substance abuse treatment. Further, Wettstein pointed out that hospital staff are obligated to provide care in the manner least restrictive of a patient's environment. Conversely, Dr. McNamara testified that the hospital was grossly negligent in allowing Whitling to have privileges on July 20 and July 21, 1993. She opined that he should have been kept in a locked ward for treatment of his psychiatric conditions. We credit the testimony of Dr. McNamara.

70. Dr. Wettstein testified that the fact that the VA Medical Center did not have Whitling's prior hospitalization records from 1972 and 1979 was not a deviation from the standard of care because it is not typical for hospitals to have all of these records. Further, he stated that it did not appear that these records were available in 1993. Conversely, Dr. McNamara testified that the hospital's failure to procure the records was a gross deviation from the accepted standards of medical care. She stated that it is standard practice to re-

quest records from prior hospitalizations because the taking of an accurate history is the primary way of reaching the correct diagnosis and psychiatric illness. She described numerous similarities between the hospitalizations in the 1970s and the 1993 hospitalization and opined that the prior records were critical to properly diagnosing and treating Whitling in June and July of 1993. We credit the testimony of Dr. Wettstein.

71. Daniel Barber, an expert for the Plaintiffs in the field of investigations, testified that once the VA Medical Center determined that Whitling was missing, an immediate and comprehensive search should have been conducted. He stated that the area in which the remains were eventually found should have been part of that search. He concluded that the VA Medical Center was grossly negligent in that its search efforts were untimely and inadequate. However, while the search was clearly less extensive than it could have been given the area where the body was found, we cannot say that it was grossly negligent.

72. Dr. Wettstein concluded that the deviations from accepted care were not causally related to Whitling's death. He stated, "My opinion is that it's not possible to make a clear determination that those exceptions led to his death. It's a matter of speculation to know that having provided any particular treatment would have changed the outcome of the case. We simply don't know. But based upon what I do know, I do not see that any changes in the treatment would have led to any clear impact or outcome in this case that would be any different." Conversely, Dr. McNamara opined that Whitling's death was reasonably foreseeable because on July 20 and July 21, 1993, Whitling was in a psychotic state and was at serious risk of injury or death. We find that the VA Medical Center ignored repeated psychiatric "red flags" and that the previously described gross deviations from the ac-cepted standard of psychiatric care led directly to Mr. Whitling's death.

## II. CONCLUSIONS OF LAW

1. This Court has jurisdiction over plaintiffs' claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–80 (West Supp.1999).

2. In an action for negligence under the FTCA, the District Court must apply the substantive law of the state where the allegedly negligent act occurred. *See* 28 U.S.C. § 1346(b)(1) (Supp.1999); *Gales v. U.S.*, 617 F.Supp. 42, 43 (W.D.Pa.), *aff'd*, 791 F.2d 917 (3d Cir. 1986). The Court is, therefore, bound to apply Pennsylvania substantive law.

3. To establish a prima facie case of negligence under Pennsylvania law, a plaintiff must demonstrate: (1) that the defendant owed a duty of care to the decedent; (2) that the defendant breached its duty; (3) that the breach proximately caused injury to the decedent; and (4) that the plaintiffs suffered actual loss or damage. *See Estate of Zimmerman v. Southeastern Pa. Transp. Auth.*, 168 F.3d 680, 684 (3d Cir.1999); *In re TMI*, 67 F.3d 1103, 1117 (3d Cir.1995); *Martin v. Evans*, 551 Pa. 496, 711 A.2d 458, 461 (1998).

4. The Pennsylvania Mental Health Procedures Act ("MHPA"), 50 Pa. Stat. Ann. § 7101 et seq., grants limited immunity to certain persons and entities who provide treatment for mentally ill persons. Section 7114(a) of the MHPA provides:

> In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or treated under this act, or that a person be discharged, or placed under partial hospitalization, outpatient care or leave of absence, or that the restraint upon such person be otherwise reduced, or a county administrator or other authorized

person who denies an application for voluntary treatment or for involuntary emergency examination and treatment, shall not be civilly or criminally liable for such decision or for any of its consequences.

50 Pa. Stat. Ann. § 7114(a) (West Supp. 1999).

5. The VA Medical Center falls within the class of entities protected by the MHPA. Thus, in order to recover, Plaintiffs must establish that the VA Medical Center was grossly negligent and that such gross negligence proximately caused Whitling's death.

■ 6. Gross negligence is less than wanton or reckless behavior and "more than ordinary carelessness, inadvertence, laxity, or indifference." *Bloom v. DuBois Regional Medical Center*, 409 Pa.Super. 83, 597 A.2d 671, 679 (1991). It is behavior which is "flagrant, grossly deviating from the ordinary standard of care." *Id.; see also Albright v. Abington Memorial Hosp.*, 548 Pa. 268, 696 A.2d 1159, 1164 (1997).

■ 7. To establish causation in a medical malpractice case, the plaintiff must introduce evidence "that a defendant's negligent act or omission increased the risk of harm to a person in the plaintiffs' position." *Mitzelfelt v. Kamrin*, 526 Pa. 54, 584 A.2d 888, 892 (1990) (quoting *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280, 1286 (1978)) (internal quotation marks omitted). If the plaintiff does so, "it then becomes a question for the [finder of fact] as to whether or not that increased risk was a substantial factor in producing the harm." *Id.* "[T]he plaintiff need not exclude every possible explanation of the accident; it is enough that reasonable minds are able to conclude that the preponderance of the evidence shows defendant's conduct to have been a substantial cause of the harm to plaintiff." *Id.*

8. We accept the testimony of Dr. McNamara that at various times throughout his stay at the VA Medical Center, including on July 20 and July 21, 1993,

Whitling exhibited psychotic symptoms and was therefore a danger to himself and others.

■ 9. The care and treatment that the VA Medical Center provided to Whitling in June and July of 1993 was a gross departure from accepted standards of psychiatric care. The hospital failed to diagnose and ascertain the cause of the psychiatric episodes which occurred on June 12 and June 20, 1993. They also provided Whitling with grossly inadequate treatment of those episodes. Further, the hospital failed to recognize, diagnose and treat the psychotic symptoms that Whitling exhibited in July of 1993 despite his repeated requests for such care and treatment.

■ 10. Given that Whitling exhibited psychotic symptoms and was a danger to himself and to others in mid July 1993 and on July 20 and July 21, 1993, it was a gross deviation from accepted standards of psychiatric care for the VA Medical Center to grant him privileges during that time period.

■ 11. The search efforts conducted by the VA Medical Center on July 21, 1993 and July 23, 1993, while inadequate, did not represent a gross deviation from the standard of care.

■ 12. We conclude that the Defendant's failure to diagnose and treat Whitling's psychotic episodes and symptoms and their concurrent granting of privileges to him substantially increased the risk of harm that occurred. Whitling was permitted to roam free while exhibiting psychotic symptoms.

13. As previously indicated, Dr. Vey testified that the position and location of the remains were most consistent with an accidental injury such as tumbling down the embankment to the bottom of the ravine. He ruled out the possibility that Whitling died as the result of a homicidal event, stating that an examination of the bony skeleton and the clothing did not reveal any evidence of trauma caused by a

third party. He also ruled out the possibility that Whitling died a natural death stating that it would be inconsistent with the position in which the remains were found. In this regard, Detective Canofari testified that Whitling's remains were found laying in a supine position on the hillside of a wooded ravine. His head was facing up the hill and to the west and his legs were pointed east and down the hill. The Court conducted an on-site inspection of the area where the body was found.

14. We have no hesitation on this record in concluding that the gross deviations from the accepted standards of psychiatric care were a substantial factor in causing Mr. Whitling's death.

## Damages

15. Whitling was 44 years old in May of 1994 when his body was found. His anticipated labor force participation would have been an additional 17.1 years, which would have taken him to the age of 61.1. He had a life expectancy of 32.5 years.

16. On the date of his disappearance, Whitling was employed as a custodian by the United States Post Office earning a salary of $24,752 per year. Based on this figure, Dr. Harvey Rosen, an expert for the Plaintiffs in the field of economics, concluded that Whitling's lost earnings from his postal position amounted to $592,310. We credit this testimony.

17. Defendant argues that Dr. Rosen calculated the lost income from the Postal Service using a productivity factor that is not supported by the evidence. However, at trial, Dr. Rosen testified that he arrived at the productivity factor of one half of one percent based on a study which indicated that post office employees and other federal employees are paid a wage rate over time which is slightly greater than the average rate of inflation. We credit this testimony and conclude that Dr. Rosen's past and future postal earnings calculations are consistent with *Kaczkowski v. Bolubasz*, 491 Pa. 561, 421 A.2d 1027, 1038–39 (1980) (holding that courts shall

consider the victim's lost future productivity and that "future inflation shall be presumed equal to future interest rates with these factors offsetting.").

18. Whitling was also entitled to a Postal Service Pension. Dr. Rosen concluded that this would amount to $90,763 through the year 2026. We credit this testimony.

19. Whitling was serving in the United States Army Reserves prior to the date of his disappearance. Dr. Rosen concluded that if he remained in the reserves until age 55, his wages would have totaled $74,671. We credit this testimony.

20. On April 27, 1973, Whitling was granted a thirty percent service-connected VA disability pension. In 1993, he received approximately $320 per month in disability benefits. At trial, retired Army Command Sergeant Major Greg Holland testified that disability benefits are adjusted downwards in the months that a reserve receives drill pay. He also testified that Whitling would have received drill pay for approximately sixty to sixty-five days out of the year. Dr. Rosen testified that to compensate for this, he calculated disability benefits for ten months out of the year instead of twelve. Further, Dr. Rosen also recognized that disability benefits are reduced by $15 a month as each of the beneficiary's children reach the age of 18. Dr. Rosen concluded that Plaintiffs are entitled to $93,153 in disability income, which represents payments for the years 1993 to 2026. We credit this testimony.

21. Whitling was also entitled to a military pension when he reached the age of 60, which would have occurred in the year 2010. Dr. Rosen concluded that this would amount to $132,295 through the year 2026.

22. Defendant relies on 38 U.S.C. §§ 5304–5305 and argues that once Whitling reached the age of 60, he would not be entitled to receive both the military pension and the disability income. Defendant maintains that he would have to make an election between the two, which would

diminish the amount of the damages. We agree. These sections of the United States Code prohibit duplication of benefits and provide that the veteran may elect to waive the portion of military pension that would be duplicative of the disability benefits; consequently, Whitling would have been entitled to receive the disability benefits and the unwaived portion of his military pension. *See* 38 U.S.C.A. §§ 5304–05 (West 1991 & Supp.1999); *see Burkins v. United States,* 112 F.3d 444, 447 (10th Cir.1997). Thus, we find that Plaintiffs are entitled to the full amount of the disability income ($93,153) and that portion of the military pension which is not duplicative. The disability income for the years 2010 through 2026 amounts to $46,362, so the military pension is reduced to $85,933.

23. We find that the total loss of income to the Plaintiffs is $936,830.

24. The loss of income must be reduced by the amount of income that Whitling would have consumed during this time frame. Dr. Rosen testified that the head of a household of six consumes 15.8% of the income; at the other extreme, the head of a household which consists only of husband and wife consumes 35.17% of the income. Based on these numbers, he concluded that Whitling would have consumed $260,130 of the income. However, this figure did not take into account the election that Whitling would have had to make between the duplicative military pension and disability benefits; taking this into account, the consumption figure must be decreased by $16,306. Thus, the total amount of the income that Whitling would have consumed is $243,824.

25. In addition to the loss of income, Dr. Rosen estimated that Plaintiffs would suffer a loss of $186,438 for the services that Whitling would have contributed to the household. However, we will not credit this testimony because it is not supported by the record; Dr. Rosen admitted that he had no personal knowledge of the particular services that Whitling contributed to the household.

26. In 1994, Plaintiffs incurred funeral expenses in the amount of $7,635. They also received a $500 funeral burial stipend from the Defendant. Consequently, the net funeral expenses incurred by Plaintiffs were $7,135.

27. Based on the above, the total economic loss to Plaintiffs is $700,141.

28. We find that Plaintiffs are entitled to non-economic damages in the amount of $600,000, which represents the pain and suffering that Mr. Whitling endured in connection with his death, as well as Mrs. Whitling's loss of consortium and the children's loss of society and guidance.

29. An appropriate order follows.